**Laura BALDWIN–LOVE Plaintiff,**

**v.**

**ELECTRONIC DATA SYSTEMS CORP. Defendant.**

**No. CIV.A.03–A–211–N.**

United States District Court, M.D. Alabama, Northern Division.

March 3, 2004.

---

**23.** Defendants' response, attachment 14.

Joseph B. Lewis, Montgomery, AL, for Plaintiff.

David A. Posner, Cleveland, OH, D. Christopher Carson, Birmingham, AL, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

ALBRITTON, Chief Judge.

### I.  *INTRODUCTION*

This case is before the court on a Motion for Summary Judgment filed by Electronic

Data Systems Corporation ("Defendant" or "EDS") on December 9, 2003 (Doc. # 14).

Laura Baldwin–Love ("Plaintiff" or "Love")[1] filed her Complaint on February 5, 2003 bringing claims pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. for wrongful discharge due to a disability,[2] and under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq. for wrongful denial of a leave of absence and retaliatory discharge.

For the reasons to be discussed, the Motion for Summary Judgment is due to be GRANTED.

## II. *SUMMARY JUDGMENT STANDARD*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## III. *FACTS*

The submissions of the parties establish the following facts, construed in a light most favorable to the non-movant:

---

1. Laura Baldwin–Love refers to herself as Love, rather than Baldwin–Love, in her brief; the court will refer to her accordingly.

2. In her Response to the Defendant's Motion for Summary Judgment, the "Plaintiff expressly abandons her claim under the Americans with Disabilities Act." Plaintiff's Response to Motion for Summary Judgment ("Plaintiff's Response") at 9.

Laura Baldwin–Love, who has Bell's Palsy, started working as a call center representative for Electronic Data Systems Corporation in January of 1998. Ninety-five percent of an EDS call representative's job involves answering customer telephone calls regarding the student loan consolidation process. Over the phone, a call representative counsels customers concerning their loan consolidation applications and helps customers with problems arising after the consolidation of their loans. The other five percent of a call representative's job involves searching computer files for information and entering customer information into the computer. Typing is part of these duties.

In February of 2002, Love approached Moises Urena, her direct supervisor, and complained that she could not answer customer calls because a facial pain prevented her from speaking on the phone. Additionally, Love informed her supervisor that she could not type because it made her left arm stiff. Shortly after Love complained to her supervisor, Urena assigned her work that did not require talking on the phone, including processing verification certificates and documenting returned mail. Previously, no one individual performed these assignments. While Urena would "work[ ] with [Love]" on adjusting her assignments to fit her condition, Urena's supervisor Lecretia Snow would "come to [Love] every day to get [her] back on the phone." Love's Deposition at p. 73, line 2; *Id.* at p. 72, lines 14–15. Despite the change in work assignments, neither Love's pay nor her benefits were changed. On March 25, 2002, Dr. Adams, Love's family physician, wrote a letter requesting that "[d]ue to patient['s] medical conditions please limit the amount of incoming phone calls, ... [because the] patient['s] conditions tend[ ] to flair up due to excessive movement of the facial muscles." Defendant's Exhibit B, at exhibit 1. Two days later, the Plaintiff began a period of leave that would result in her termination in less than four months.

In February of 2002, the Plaintiff was diagnosed with Bell's Palsy by her family physician, Dr. Adams, who referred her to Dr. Bell for treatment starting in late February. Love's symptoms included facial numbness and weakness in her left arm. The Plaintiff began taking medication that helped to some small degree, but mainly resulted in her being tired and woozy. On May 5, 2002, the Plaintiff was referred to another neurologist, Dr. Robert Slaughter, to undergo a different form of treatment. She was also referred in late May of 2002 to Dr. Pradhan for pain therapy.

On March 6, 2002, Dr. Bell declined the Plaintiff's request for an excuse for three to four weeks off of work. Instead, she gave the Plaintiff an excuse for one week off from work. On April 8, 2002, Love requested that Dr. Bell complete a disability form for her and give her an additional week off from work. Dr. Bell stated: "The patient has asked for a week off of work. I did sign the excuse for that. I explained to the patient that I do not feel that she is disabled and that I will complete the disability forms candidly." Defendant's Exhibit K. Furthermore, Dr. Pradhan's evaluation indicated that the Plaintiff retained all of the skills and abilities necessary to perform her job. Defendant's Exhibit C. Although noting that Love could have pain related limitations, Dr. Pradhan answered "no" to the question "are there any limitations that would impair her ability to perform the requirements of this position." *Id.*

The Plaintiff took multiple leaves of absence in 2002. She took a leave of absence to care for her ill mother that EDS approved as FMLA leave. She also requested leaves of absence due to her medical

condition. On March 27, 2002, the Plaintiff was placed on a medical leave of absence pending required medical certification. The Plaintiff was on a continuous leave of absence from March 27 through the middle of April. The Plaintiff then returned to work briefly, before taking a leave of absence from April 22 through April 29. Between April 29 and May 29, the Plaintiff repeatedly missed work, but provided medical excuses for her absences. On May 29, the Plaintiff began a leave of absence, from which she did not return. She was terminated by EDS on July 11, 2002. The Defendant summarizes the Plaintiff's absence in this manner: "[B]etween March 27, 2002 and July 11, 2002, [the] Plaintiff worked only eleven full days and was absent for fifty-nine." Defendant's Brief at 8.

EDS employs a third party administrator, Synchrony, a division of the Metropolitan Life Insurance Company ("MetLife"), to handle requests for leaves of absence pursuant to the Family Medical Leave Act ("FMLA"). "Synchrony interacts with employees of its customers and notifies them of their responsibilities while on or for obtaining an FMLA leave of absence." Exhibit N at ¶ 4. Once Synchrony is notified by its customer, EDS, that an employee, Love, has requested an FMLA leave of absence, it sends an FMLA packet that contains a blank Healthcare Provider Certification, a description of the employee's rights under the FMLA, and a cover letter stating the employee is required to submit a completed Healthcare Provider Certification within fifteen days of the date of the letter and that failure to do so will result in denial of the request for FMLA leave. Love received such a packet in "early April or around that time frame .…" Love's Deposition at p. 146, lines 9–12. Shirley Kimber–Burgess, a Team Coach for Synchrony, indicates that "[t]here is no record that a completed Healthcare Provider Cer-

tification was received by Synchrony before June 12, 2002. There is also no record that a completed Health Care Provider Certification covering all of Plaintiff's absences prior to June 12, 2002 was received by Synchrony." Exhibit N at ¶ 6.

Representatives of Synchrony contacted the Plaintiff on April 4, 2002 to remind her about the certification, that her leave would be denied without it, and that Synchrony needed the form by April 17, 2002. Love was contacted again by phone on April 17, 2002 to inform her that her claim for FMLA leave could not be approved without this certification and that it had not been received. Love indicated that her physician's office had the form and that she could rush its completion. In an April 17, 2002 letter, JeGenna Huggins, a disability case manager for MetLife, informed Love that her request for FMLA leave was denied because she failed to provide the required medical certification. The letter also indicated that a period of review was available for fifteen days. The letter was sent to Love's last known address with EDS. The address listed was her mother's address, where she was still receiving mail; she failed to update her address with EDS. The Plaintiff did not receive the letter. In a May 15, 2002 letter, which the Plaintiff received from Lecretia Snow, a form was provided to be completed by no later than May 23, 2002. The Plaintiff did not return the form until sometime in June.

Between April and July, a relatively steady process transpired in which the Plaintiff repeatedly provided the Defendant or Synchrony with medical excuses and some medical information, but failed to provide a medical certification for her FMLA leave. When returning from absences, the Plaintiff brought medical excuse notes. These notes offer the name of the physician, the patient, the dates that

she was being treated, and the day that she could return to work. Some of the notes explain the reason for her absence on a particular day or over a stretch of two or three days; some do not provide such an explanation.[3] On May 28, 2002, the Plaintiff faxed to Synchrony an Attending Physician Form completed by Dr. Adams. The form, however, was not completed by her treating physician Dr. Bell, nor did it contain an assessment of her physical capabilities or when her employer could anticipate her return to work. The form also failed to indicate whether Love could continue to perform her job. Furthermore, Dr. Adams did not advise the patient to cease her occupation. On June 10, Synchrony contacted Love to inform her that this certification was inadequate, insisting upon a certification from Dr. Bell, who was her treating physician at least from late February 2002 through early May 2002. Having attended work sporadically during the month of May, Love once again took a leave of absence after May 29, 2002. This leave of absence was caused by her need for a program of pain therapy treatment that required a series of injections. On June 12, 2002, she provided a medical certification for these absences from Dr. Pradhan.

On June 28, 2002, Love contacted both EDS and Synchrony indicating that she would provide a medical certification for her prior uncertified absences. She was reminded of the fifteen day window for appealing, but the Synchrony representative indicated that if she faxed her records that day and submitted her written appeal then Love's appeal would be considered. She failed to submit the certification on June 28, 2002. On July 3, 2002, Jarvis Davis, a loan consolidation deputy account manager, sent Love a letter affirming the potential consequences of her failure to provide certification as well as granting Love an additional opportunity to submit the proper documentation:

> This letter is to notify you that you must provide documentation from your health care provider that substantiates your absences since March 27, 2002 through this date, by no later than 12 noon on July 11, 2002. If you do not provide the appropriate doctor's certification by 12 noon on July 11, 2002, you may be subject to disciplinary action up to and including termination of your employment for unexcused absences.

> Defendant's Exhibit 0.

Around the middle of July, Love was informed that paperwork had been sent to

---

3. On April 8, 2002, Love received a certificate to return to work note from Dr. Bell indicating that she could return to work in one week with no restrictions. No explanation of the nature of the illness or infirmity was provided. In a letter dated April 29, 2002, Love received a similar note indicating that she had been under Dr. Bell's care from April 24, 2002 through April 26, 2002, and that she could return to work on April 29, 2002. No further explanation of the absence was provided. On May 3, 2002, Love received a certificate to return to work note stating that she was under Dr. Pou's care on that day and could return to work on May 6, 2002. No additional explanation was provided. On May 10, 2002, Dr. Bell gave Love a return to work note indicating that Love was under her care on that day for a Doctor's appointment and could return to work on May 13, 2002 with no restrictions. Dr. Pradhan provided a certificate of professional care on May 20, 2002 stating that Love was under the doctor's care on that day for neck and upper extremity pain requiring interventional pain treatments, but could return to work the following day. On May 23, 2002, Dr. Pradhan provided a similar note with the added explanation that medication was required that made it impossible for Love to drive or go to work, but that she could return to work on May 27, 2002. Dr. Pradhan provided a note on May 29, 2002 referencing Love's pain and indicating that she could return to work on June 3, 2002 and once again on June 3, 2002, stating that she could return to work on June 6, 2002.

Dr. Adams, her family doctor. Dr. Adams's office informed her that Dr. Bell would have to complete the paperwork, because she was Love's treating physician. Dr. Bell informed Love that it would be at least three to six weeks before the paperwork could be completed due to necessity of her personal attention to the paperwork and other paperwork being in-line before Love's. Love Deposition at p. 39, lines 14–23; p. 40, line 1. Love contacted her employer to notify them that the certification would not be submitted until after noon on July 11, 2002. Jarvis Davis informed her that she would "see what they can do[,][but] ... [they] didn't call [Love] back ...." *Id.* at p. 144, lines 9–11. Despite Dr. Bell's statement that the paperwork could not be completed for three to six weeks, the paperwork was faxed much sooner to the Defendant.

Nearly six hours after the deadline, at 5:55 p.m. on July 11, 2002, a fax, that was supposed to be four pages, was sent from Dr. Bell that included two return to work forms and the first page of the FMLA certification form. This fax was sent to Angela Cotton, Love's sister, who works for EDS, and Davis. The work return certificates cover one of the periods of time for which the Defendant asserts the Plaintiff failed to provide an adequate medical certification, March 27, 2002 through April 15, 2002. The form did not contain the page on which Dr. Bell's signature could be found, which on this form is also the same page where a physician provides information regarding the ability of the Plaintiff to perform essential functions of her job or work of any kind. On December 31, 2003, during the course of this litigation, the Plaintiff obtained the other page of the FMLA certification. The form indicated that Plaintiff was not prevented from performing work of any kind and that Dr. Bell was unable to assess whether Love was able to perform the essential functions of her specific job, "not know[ing] the job duties." Plaintiff's Exhibit 21.

On July 15, 2002, Davis sent to Love a termination letter:

On July 3, 2002, you were sent a letter notifying you that you must provide documentation from your health care provider that substantiates your absences since March 27, 2002 through July 3, 2002, by no later than noon on July 11, 2002. This letter is to inform you that based on your failure to provide the necessary documentation by the required timeframe; your employment has been terminated effective July 11, 2002.

Defendant's Exhibit T.

## IV. *DISCUSSION*

French playwright Jean–Baptiste Molière suggested in his play *The Misanthrope* that no good deed goes unpunished. EDS repeatedly gave Love opportunities to remedy her failure to provide adequate medical certification. In addition to standard channels of acquiring information about FMLA rights, EDS also provided her a toll free telephone number access to a Synchrony representative, paid by her employer to aid in implementing a FMLA leave program for EDS. The question now before this court is whether EDS's actions of repeatedly giving the Plaintiff opportunities to obtain a sufficient medical certification result in liability under the FMLA.

Pursuant to the FMLA, subject to the certification requirements of 29 U.S.C. § 2913, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period for one or more of the following: [including] [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Employ-

ers, under the FMLA, "may require that a request for leave ... be supported by a certification issued by the health care provider of the eligible employee." 29 U.S.C. § 2613(a). A certification is sufficient if it states "(1) the date on which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition; ... (4)(B) for purposes of leave under section 2612(a)(1)(D) of this title, a statement that the employee is unable to perform the functions of the position of the employee." 29 U.S.C. § 2613(b).[4]

Congress requires that an "employee shall provide, in a timely manner, a copy of such certification to the employer." 29 U.S.C. § 2613(a). The Department of Labor regulations are more specific. When providing medical certification before the leave period begins is impossible, "the employee must provide the requested certification to the employer within the time frame requested by the employer (which must allow at least 15 calendar days after the employer's request), unless it is not practicable under the particular circumstances to do so despite the employee's diligent good faith efforts." 29 C.F.R. § 825.305(b) (2003). Thus, an "employer may require certification from the employee's physician (or other health care provider) that the employee indeed has such a condition, ... but if he does so he [or she] must (if the health condition was unforeseeable) give the employee at least 15 calendar days in which to submit it." *Rager v. Dade Behring, Inc.*, 210 F.3d 776, 777 (7th Cir.2000) (internal citations omitted)

(citing 29 C.F.R. § 825.305); *see also Curry v. Neumann*, 2000 WL 1763842, at *4 (S.D.Fla. April 3, 2000) (citing 29 C.F.R. § 825.305(b)) (concluding that "[t]he regulations require the employer to allow 15 days from when it requests a medical certification for the employee to produce it."). An employer may also provide for a more generous deadline or dispense with the certification requirement in its entirety. *Rager*, 210 F.3d at 777. It is possible that the time period for certification may be tolled through equitable estoppel or equitable tolling. *Rager*, 210 F.3d at 778–79. "At the time the employer requests certification, the employer must also advise an employee of the anticipated consequences of an employee's failure to provide adequate certification." 29 C.F.R. § 825.305(d) (2003). The Department of Labor also mandates that "[t]he employer shall advise an employee whenever the employer finds a certification incomplete, and provide the employee a reasonable opportunity to cure any deficiency." *Id.*

An employee's right to FMLA leave is subject to the certification requirements of 29 U.S.C. § 2613. 29 U.S.C. § 2612. Failure to meet the certification requirements renders the employee's absences unprotected by the FMLA. *See Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir.2000) (stating "Cash did not provide APCO with certification that her medical conditions met the statutory standard, and therefore the medical leave that she did take was not under the auspices of the FMLA."). If these uncertified, hence unprotected, absences violate an attendance policy, an employer may terminate an em-

---

4. "Certification is sufficient if it states the date on which the serious health condition commenced, the probable duration of the condition, the appropriate medical facts within the knowledge of the health care provider regarding the condition, and a statement that

the employee is unable to perform the functions of the position of the employee." *Parris v. Miami Herald Pub. Co.*, 216 F.3d 1298, 1302 n. 2 (11th Cir.2000) (citing 29 U.S.C. § 2613(a)-(b)).

ployee without violating the FMLA. *See Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 331–32 (5th Cir.1998); *Harrington v. Boysville of Michigan*, 145 F.3d 1331, 1998 WL 252755, at *6 (6th Cir.1998); *Rager*, 210 F.3d at 777–79; *Curry*, 2000 WL 1763842, at *5. The Defendant contends that Love failed to provide a timely or sufficient certification. Therefore, the Defendant reasons that Love's absences, as well as her termination, are unprotected under the FMLA.

The Plaintiff counters by arguing that "[t]he statute and regulations governing the FMLA appear to dislike any arbitrary and capricious setting of deadlines ...." Plaintiff's Response at 10. The Plaintiff notes that "[i]t is undisputed Ms. Love provided a Certification of Health Care Provider Form from Dr. Pradhan on June 12, 2002." *Id.* Furthermore, the Plaintiff argues that "[e]ven though [Love] was already in substantial compliance with the Family and Medical Leave Act by providing Dr. Pradhan's Certification of Medical Provider Form, [she] provided a second certification on July 11, 2002, at approximately 5:55 from Dr. Bell." *Id.* at 12. With regard to this certification, Love notified EDS that Dr. Bell's Office would not be able to respond by noon on July 11, 2002. She argues that she should not be held responsible for Dr. Bell's Office submitting the form late. Nor does Love believe that she should be held responsible for the form being incomplete: "If Ms. Love had known that the signature page was missing from Dr. Bell's certification, she could have gone to Dr. Bell's office as she did on December 31, 2003, and retrieved a copy of the complete certification filled out on July 11, 2002." *Id.* at 13.

A. The Pradhan June 12, 2002 Certification

■ The Plaintiff is correct that "[i]t is undisputed Ms. Love provided a Certifica-

tion of Health Care Provider Form from Dr. Pradhan on June 12, 2002." Plaintiff's Response at 10. There is, however, disagreement over which of Love's absences Dr. Pradhan's June 12, 2002 certification form addresses. The Plaintiff argues that the certification is applicable to the Plaintiff's absences between March 27 and April 22. The Defendant disagrees, describing the Plaintiff's argument for the applicability of the June 12, 2002 certification to the Plaintiff's absences in March and April as "disingenuous." Defendant's Reply Brief at 3. The Defendant contends that "[i]n making this argument, [the] Plaintiff spuriously attempts to turn what EDS and she indisputably understood was a certification for absences commencing May 29, 2002 and going forward for two to three months into something that it plainly is not." *Id.* The Defendant also accuses the Plaintiff of "not only distort[ing] the plain meaning of the language on the form itself, but also ignor[ing] other undisputed facts which unequivocally show that not even [Love] interpreted the June 12, 2002 document as sufficient to qualify her March/April absences as FMLA leave." *Id.*

The certification form provides the date on which the serious health condition commenced, the probable duration of the condition, the medical facts within the knowledge of the health care provider regarding the condition, and a statement that the employee is unable to perform not only the duties of her position, but any work. Thus, the form appears to meet the certification sufficiency requirements of 29 U.S.C. § 2613(b). The question remains though, what absences does this form certify as being medically warranted under the FMLA. More specifically, are the Plaintiff's absences in March and April of 2002 medically certified? The court does not find Dr. Pradhan's certification to offer the clarity or plain meaning suggested by

the Defendant. Nevertheless, although the Plaintiff's interpretation that the form certifies all of her absences after March 2, 2002 is initially appealing, ultimately the court must conclude that this interpretation is unreasonable.

The reason the Plaintiff's argument appears at first glance to be correct is that the form states that the Plaintiff's condition commenced on March 2. Furthermore, Dr. Pradhan failed to provide a different date for the probable duration of the Plaintiff's present incapacity, which the form requests the doctor to provide, if it is different than the commencement date. This seems to be the start of a strong argument that the Plaintiff's absences are medically certified from March 2 through her termination on July 11, 2002. The surrounding uncontroverted evidence, however, renders this interpretation of Dr. Pradhan's June 12, 2002 certification unreasonable. The court bases this conclusion primarily, though not exclusively, on the Plaintiff's deposition and affidavit, the certification of professional care notes Love received from Dr. Pradhan to submit to EDS, and Dr. Pradhan's June 6, 2002 evaluation of the Plaintiff.

In her deposition and affidavit, the Plaintiff advances her belief that Dr. Pradhan's certification addressed her future absences, that is, absences beginning in May of 2002. The following exchange is contained in her deposition:

Q: Do you know approximately when it was that that was sent, the form from Dr. Pr[ad]han?

A: It was sent right when I started my treatment, right after I started my treatment, probably after my third injection. It was right before I went out on leave. I can't recall the date. I know it was in May.

Q: Are you sure that it wasn't later than May.

A: She stated that she sent it in May. She sent it, and then she resent it because I called her and let her know that they claimed they didn't receive it.

Q: And was what you understood that documentation to be is documentation explaining that looking out to the future there's going to be times where she's going to need to be intermittently away from work?

A: Correct.

Q: Is that the way you understood it to be?

A: Correct, based on the injections.

Love Deposition at p. 179, lines 3–23; p. 180, lines 1–4.

The injections were part of the pain therapy treatment that Love received, while being treated by Dr. Pradhan beginning in May of 2002. Furthermore, when asked "[b]ut the information substantiating your absences from the period March 27, 2002, through at least the middle of April 2002 was not provided from your doctor by noon July 11th, correct?" *Id.* at p. 101, lines 16–21. Love answered, "[c]orrect." *Id.* at p. 101, line 22. In her affidavit, Love states "Dr. Pradhan sent the form . . . on or about June 12, 2002 . . . at my request because I knew if I was going to be out for more than two weeks, EDS was going to request it. I was going to be out for more than two weeks because of the interventional pain therapy/injections with which Dr. Pradhan was treating my Bell Palsy." Love's Affidavit.[5]

The submissions of the parties, even viewed in the light most favorable to the non-movant, the Plaintiff, nevertheless, establish that at least until June 6, 2002, Dr. Pradhan did not believe the Plaintiff was incapable of working. Dr. Pradhan's May

5. The Plaintiff failed to number the para-    graphs in her affidavit.

20, 2002 certificate of professional care note for the Plaintiff indicated that she could return to work on May 21, 2002. Dr. Pradhan's certificate of professional care note for May 23, 2002 stated that Love could return to work on May 27, 2002.

Dr. Pradhan's June 6, 2002 evaluation of Plaintiff's skills and abilities is even more problematic for the Plaintiff's interpretation of the June 12, 2002 certification. Asked whether Love was able to perform certain necessary skills and retained certain critical abilities to perform her job, Dr. Pradhan answered affirmatively. Dr. Pradhan found that Love still possessed all of the necessary skills and abilities to perform her job: the ability to multi-task, to demonstrate effective oral communication skills,[6] to act as a liaison between the customer, vendors and other resources, to provide technical troubleshooting assistance to customers over the telephone, to work in a professional manner within a team environment, to utilize a personal computer (pc) to perform various duties to include logging customer calls into the database, verifying clients receive daily communications for up to 8 hours per day, to work five 8–hour workdays 7 a.m. to 4 p.m. or 10 a.m. to 7 p.m. for a total of 40 hours per week,[7] and to arrive at work by designated start time.[8] Asked "are there any limitations that would impact her ability to perform the requirements of this position[,]" Dr. Pradhan answered "no." Plaintiff's Exhibit 14. Dr. Pradhan did, however, indicate that limitations on the skills and abilities that she previously mentioned would last for approximately three to four months. By June 12, 2002, Dr. Pradhan concluded that the Plaintiff was "unable to perform work of any kind." Plaintiff's Exhibit 15.

Independently, the Plaintiff's understanding of the certification as only applying to her absences for the pain therapy injection treatment, which began in May 2002, Dr. Pradhan's certificates of professional care, which indicated that the Plaintiff could return to work, or Dr. Pradhan's June 6, 2002 evaluation might be inadequate to render the Plaintiff's interpretation of the June 12, 2002 certification unreasonable. Taken together, however, the court cannot, even viewing the facts in the light most positive to the Plaintiff, view the June 12, 2002 certification as sufficiently certifying as FMLA approved Love's March and April absences, a period of time prior to Dr. Pradhan's treatment of Love, particularly in light of Dr. Adams' certification stating that she did not advise Love to cease working.

**B. Dr. Bell's 5:55 p.m. July 11, 2002 Certification**

The Plaintiff argues that even if the June 12, 2002 certification fails to address her March and April absences, the certification by Dr. Bell on July 11, 2002 covers the Plaintiff's absences. It is undisputed by the parties that the Defendant gave the Plaintiff an ultimatum requiring the submission of a certification form by July 11, 2002 at noon, and that an incomplete certification form was not transmitted until 5:55 p.m. on July 11, 2002, after the deadline. The certification form trans-

---

**6.** The doctor did find some potential limitations with this ability.

**7.** The doctor did indicate that Love's work schedule would be interrupted because she was undergoing interventional pain therapy and would need 2 days off after injections about six times within a one year span.

**8.** The doctor found some limitations in her ability to arrive at work at the start time based on pain, but noted that the treatment was reducing her pain.

mitted by Dr. Bell's office failed to include in the faxed transmission the page containing the physician's signature and the statement of whether the Plaintiff could continue to perform her job during her absence in March and April of 2002.

The Plaintiff, citing Department of Labor regulation 825.305(d), notes that an employer is required to "advise an employee whenever the employer finds a certification incomplete, and provide the employee a reasonable opportunity to cure any such deficiency." The Plaintiff asserts that "[i]f Ms. Love had known that the signature page was missing from Dr. Bell's certification, she could have gone to Dr. Bell's office as she did on December 31, 2003, and retrieved a copy of the complete certification Dr. Bell filled on July 11, 2002." Plaintiff's Reply at 12. To complete the certification, which does not appear to have been accomplished as of filing of this opinion of the court, the Plaintiff needed to do more than turn in the missing page. In response to the question of whether Love "is ... unable to perform work of any kind[,]" Dr. Bell answered "no." Plaintiff's Exhibit 21. As to whether Love was incapable of performing the essential functions of her job, Dr. Bell answered as follows: "I cannot answer, I do not know [the] job duties." Plaintiff's Exhibit 21. Thus, in addition to turning in this missing page, Love also needed to provide "a statement that the employee is unable to perform the functions of the position of the employee." 29 U.S.C. § 2613(b)(4)(B). Without such a statement, even if the missing page was submitted, the certification would be incomplete. Although the Plaintiff does not address this issue, she does contend that EDS was required to allow her reasonable time to cure the deficiencies of her incomplete certification.

There are several problems with the Plaintiff's argument. The regulation cited by the Plaintiff is part of a comprehensive code of rights and responsibilities that requires an employee to return a certification to the employer within the time frame requested by the employer, which must allow at least 15 calendar days, unless despite the employee's diligent and good faith efforts, it is not practicable to do so under the particular circumstances. 29 C.F.R. § 825.305(b) (2003). The FMLA is designed "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity." 29 U.S.C. § 2601(b)(1). The FMLA seeks to achieve this goal by giving employees the right "to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2). With the FMLA, however, these objectives are to be achieved "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(3). As part of this balancing, Congress made an employee's right to FMLA leave subject to the certification requirements of 29 U.S.C. § 2613. 29 U.S.C. § 2612.

In considering the balancing of employees' and employers' rights and responsibilities, this court is unwilling to impose out of context the Department of Labor regulations that are applicable to a fifteen day window, longer if that time period is impracticable, to second, third, and fourth opportunities given to an employee to submit a certification. In effect, the Plaintiff is seeking to punish the Defendant for allowing her additional chances after she failed to provide the certification earlier as requested. The Plaintiff agreed that she received "in kind of early April or that time frame" a packet that included the medical certification form for her absence that began in March. Love's Deposition at

p. 145, lines 20–23; at p. 146, lines 10–12. The Plaintiff was repeatedly given opportunities by her employer to provide a completed medical certification in April, May, June, and early July. She was repeatedly warned that if she if failed to do so, her absences would not be protected by the FMLA. If the deficiency had been within the fifteen day time period, or if Love demonstrated that the fifteen day time period was impracticable under the circumstances of this case, demonstrated that estoppel would be warranted in this case,[9] the court would be more receptive to the Plaintiff's argument that the employer was required to allow her to cure the deficiency.

██ Furthermore, the Plaintiff's certification, when the deadline passed at noon on July 11, 2002, was not incomplete, but instead was non-existent. Under the Department of Labor regulations, an employer is required to notify an employee when it finds a certification incomplete and requires the employer to allow the employee a reasonable period of time to cure any deficiency. 29 C.F.R. § 825.305(d) (2003). Without providing a reasonable opportunity for the employee to cure the deficiency, an employer cannot terminate an employee for an incomplete certification. *See Marrero v. Camden County Bd. of Soc. Servs.*, 164 F.Supp.2d 455, 466 (D.N.J.2001). An incomplete certification is akin to an inadequate certification or a certification that fails to provide the information requested by the employer. *See Strickland v. Water Works and Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1209 n. 12 (11th Cir. 2001) (using the term inadequate and incomplete as interchangeable, the Eleventh Circuit noted that the "federal regulation interpreting the certification provision of the Act states that if the certification is inadequate, '[t]he employer shall ... provide the employee a reasonable opportunity to cure any such deficiency.' 29 C.F.R. § 825.305(d)."). An incomplete certification is not the same as a certification that is non-existent or that has not been provided to the employer.[10] Submitted after the deadline, the form submitted is an untimely certification that is also incomplete. Nor should this court shift the blame to the employer for Dr. Bell's failure to submit the form before noon on July 11, 2002. The Department of Labor regulations provide an escape valve from the fifteen day window, where "despite the employee's diligent, good faith efforts" certification is "not practicable under the particular circumstances." 29 C.F.R. § 825.305(b) (2003). Love's failure to pursue this certification from Dr. Bell before the middle of July cannot fairly be described as having acted diligently. Thus, it would be inappropriate to apply this exception.

██ The Department of Labor regulations state that "[i]f the employee never produces the certification, the leave is not

---

9. Though there are some facts raised by the Plaintiff that could potentially point towards estoppel being warranted, the Plaintiff fails to make this argument and there is no clear reliance on the extensions or the employer's deadlines. It appears that Love missed deadlines and then was then given additional opportunities by EDS to provide the certification. Because the Plaintiff has not raised this argument and the Court finds no clear basis for applying the doctrine of estoppel, further consideration of this issue is not warranted.

10. *Neppl v. Signature Flight Support Corp.*, 234 F.Supp.2d 1016, 1027 (D.Minn.2002) (concluding that "the court does not agree with plaintiff's suggestion that 'incomplete' and non-existent are synonymous. An employer cannot 'find a certification incomplete' if the employer cannot find it at all because the employee has not produced it."); *but see Urban v. Dolgencorp of Texas, Inc.*, No. Civ. A. 1:02–CV–212–C, 2003 WL 21804916, at * 3 (N.D.Tex. Aug. 6, 2003).

FMLA leave." 29 C.F.R. § 825.311(b) (2003). Love still as of the filing of this opinion has failed to produce a medical certification for her absences in March and April of 2002. The certification from Dr. Bell is incomplete even when the final page is considered, for it fails to indicate whether Love was able to perform her job duties during her absence. Plaintiff's Exhibit 21. As previously stated, Congress requires that an "employee shall provide, in a timely manner, a copy of such certification to the employer." 29 U.S.C. § 2613(a). Stretching individual provisions the Department of Labor regulations outside of the context of the comprehensive scheme does not alter the simple reality that Congress and these regulations require greater promptness from the Plaintiff than was demonstrated in this case. Although EDS might have been even more flexible with Love that it was, the regulations do not require such flexibility. Under the FMLA, granting Love multiple opportunities to certify her absences from March and April of 2002, does not subject EDS to further liability, expect potentially under circumstances not present in this case. Due to her failure to certify, these absences are unprotected by the FMLA. Thus, EDS did not contravene the FMLA by terminating Love's employment on this basis.

▮ To prove retaliation or discrimination under the FMLA, Love must show that "(1) she availed herself of a protected right; (2) she suffered an adverse employment decision; and (3) there is a causal connection between the protected activity and the adverse employment decision." *Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir.2000) (quoting *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir.2000)). In *Cash*, the Eleventh Circuit indicated that the Plaintiff failed to present evidence that she exercised or availed herself of a pro-tected right under the FMLA. *Cash*, 231 F.3d at 1307. The court noted that "Cash did not provide APCO with certification that her medical conditions met the statutory standard, and therefore the medical leave that she did take was not under the auspices of the FMLA." *Id.* Thus, "the district court correctly granted APCO's motion for summary judgment on the FMLA count." *Id.* Love failed to provide certification for her absences; accordingly, she did not avail herself of the protections of the FMLA. Therefore, Love's claim for retaliatory discharge under the FMLA is due to be dismissed.

## V. CONCLUSION AND ORDER

For the reasons discussed above, the Defendant's Motion for Summary Judgment is due to be Granted as to all of the Plaintiff's claims, wrongful discharge due to a disability under the ADA, and for wrongful denial of a leave of absence and retaliatory discharge under the FMLA.

1) Defendants' Motion for Summary Judgment is ORDERED GRANTED.

2) A separate Judgement will be entered in accordance with this Memorandum Opinion and Order.

### FINAL JUDGMENT

In accordance with the Memorandum Opinion and Order entered on this day granting the Defendants' Motion for Summary Judgment,

Judgment is hereby entered in favor of Defendant, Electronic Data Systems Corporation, and against Plaintiff Laura Baldwin–Love. Costs are taxed against the Plaintiff.